1

2

3

4

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

5

6

7

8

9

10

| | |
|---|---|
| **DAVID COUCH,** | **1:14-cv-10-LJO-JLT** |
| **Plaintiff,** | **MEMORANDUM DECISION AND ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 47) AND DEFENDANTS' PETITION FOR AN ORDER PERMANENTLY STAYING ARBITRATION PROCEEDINGS AND/OR FOR AN ORDER GRANTING PRELIMINARY INJUNCTION (Doc. 51)** |
| **v.** | |
| **MORGAN STANLEY & CO., INC., MORGAN STANLEY SMITH BARNEY, LLC,** | |
| **Defendants.** | |

11

12

## I. INTRODUCTION

13

14

15

16

17

18

19

Plaintiff David Couch ("Plaintiff" or "Couch") was a Financial Advisor ("FA") for Defendant Morgan Stanley Smith Barney[1] ("MSSB," "Morgan Stanley," or "the Firm") from September 2007 until his termination in January 2013. Doc. 20, First Amended Complaint ("the FAC"), at ¶¶ 6, 28. Plaintiff alleges MSSB unlawfully terminated him and brings claims against the Firm for (1) violation of California Labor Code section 1101(a)[2]; (2) violation of section 1102; (3) violation of section 98.6; (4) intentional interference with existing and prospective economic relationships; (5) and negligent interference with existing and prospective economic relationships. FAC at 9-19.

20

21

Plaintiff filed this suit on January 2, 2014 and filed the currently operative FAC on May 9, 2014. On June 5, 2015, MSSB moved for summary judgment on the ground the Firm's termination of Plaintiff

22

---

23

24

[1] "The company that hired Plaintiff . . . was called Morgan Stanley & Co., Incorporated, which is now Morgan Stanley & Co. LLC. A Morgan Stanley & Co. LLC entity later entered into a joint venture with Smith Barney, and the company that employed Couch became Morgan Stanley Smith Barney LLC." Doc. 66-1, MSSB's Separate Statement Reply in Support of Defendants' Motion for Summary Judgment or, in the Alternative, Summary Adjudication ("UMF"), at 1 n.1. Because the parties do so, the Court also will refer to Defendants collectively as a single entity unless otherwise indicated.

25

[2] All further statutory references are to the California Labor Code unless otherwise indicated.

1   was lawful. Doc. 47 at 1. On June 11, 2015, MSSB's counsel came into possession of an arbitration

2   claim filed by Plaintiff on June 2, 2015, requesting arbitration before the Financial Industry Regulatory

3   Authority ("FINRA") that, in her view, contained related and identical claims to those now pending

4   before the Court. Doc. 50-1, Declaration of Mary C. Dollarhide ("Dollarhide Decl. 1") at ¶ 2; Doc. 51-2.

5   MSSB contends Plaintiff has waived any and all rights to pursue arbitration before FINRA. *See* Doc. 51

6   at 11. Accordingly, on June 17, 2015, MSSB filed a petition requesting a permanent injunction against

7   the FINRA arbitration or a preliminary injunction against the proceeding while the petition and MSSB's

8   motion for summary judgment are pending. Doc. 51 at 5.

9       For the following reasons, the Court (1) GRANTS MSSB's motion for summary judgment; (2)

10   DENIES AS MOOT MSSB's motion for a preliminary injunction against the FINRA arbitration; and (3)

11   DENIES MSSB's motion to permanently enjoin the FINRA arbitration.

12              **II. <u>FACTUAL BACKGROUND</u>[3]**

13       In 2007, MSSB recruited Plaintiff, Brad Barnes, and Lance Horton as a 3-person team known as

14   "the Buena Vista Group." UMF #31. Plaintiff held a 16% interest in the Buena Vista Group clients who

15   are identified as the "Couch Client Transferees." UMF #32.

16       MSSB hired Plaintiff as a full-time FA in September 2007. UMF #2; Doc. 47-17, Declaration of

17   Rachell Fanucchi ("Fanucchi Decl.") at ¶ 4. It is unknown how many of his Buena Vista Group clients

18   were part of his portfolio when he joined MSSB. UMF #34. Each FA at MSSB works full-time; there

19   are no part-time FAs. Doc. 48-7, Deposition of Rob Hampton ("Hampton Depo.") at 57:15-19. Pursuant

20   to the Financial Advisor Employment Agreement ("the Employment Agreement") between Plaintiff and

21   MSSB, Plaintiff's position was "strictly at-will and may be terminated by either party, for any reason or

22   for no reason, at any time, with or without notice, and with or without cause." Doc. 48-1, Deposition of

23

24   _____

25   [3] The Court has considered the entire record, but will discuss only the facts and evidence necessary to resolve MSSB's motions. In addition, the Court will only rule on the parties' numerous evidentiary objections and motions to strike when necessary.

1   David Couch ("Couch Depo."), Ex. 3 at 1. The Employment Agreement further provided that "all

2   customers [Plaintiff] serviced while with MSSB were customers of MSSB," UMF # 27, and that

3   "nothing in the Agreement is intended to affect, change, modify or otherwise alter in any way []

4   [MSSB's] ownership of client accounts." Couch Depo., Ex. 2. Thus, Plaintiff had no personal contracts

5   or agreements between himself and the clients he serviced while at MSSB because they were

6   exclusively MSSB's clients. UMF ##28-29; Couch Depo. at 44:11-45:8.

7       At the time he joined MSSB, Plaintiff was a member of the City Council of Bakersfield ("the

8   City Council"), which is a part-time position. UMF #3. MSSB's Code of Conduct provides that MSSB

9   employees, including FAs, "may not engage in certain activities *outside the scope of their employment*

10  *with the Firm* without prior written approval." Couch. Depo., Ex. 5 at ¶ 2.3.1. Among other things,

11  MSSB employees "must obtain prior written approval . . . to [s]eek or remain in any political or

12  governmental office, or serve or remain on a public or municipal board or similar public body." *Id.* Prior

13  to joining MSSB, Plaintiff requested approval from MSSB to continue to serve on the City Council and

14  to run for and potentially serve on the non-partisan Kern County ("the County") Board of Supervisors

15  ("the Board"), if elected. UMF #4; Couch Depo., Ex. 9 at 1. On June 15, 2007, MSSB issued a

16  memorandum to Plaintiff and his future supervisor, Rachell Fanucchi, outlining their respective

17  obligations concerning Plaintiff's continued service on the City Council and his potential running for

18  and serving on the Board ("the June 2007 memo"[4]) while employed as an FA at MSSB. Couch Depo.,

19  Ex. 9. MSSB permitted Plaintiff to serve on the City Council for over five years while employed by the

20  Firm. UMF #3.

21      In July 2008, Plaintiff requested and received Firm approval for at least three "Outside Business

22  Interests" ("OBIs") forms. MSSB permitted Plaintiff to serve as (1) a board member for the Boy Scouts

23  of America; (2) a board member for the Bakersfield Homeless Center; and (3) a board member for

24

---

25  [4] Plaintiff refers to this document as the "MS&Co. Consent Re Public Office" or "CPRO." *See* Doc. 56 at 9.

1    Youth of Christ of Kern County. Couch Depo., Exs. 14, 16, 18. In approving those OBI requests, MSSB

2    explained, among other things, that Plaintiff "must continue to devote [his] entire time during normal

3    business hours to Firm matters" because "[t]here are potential regulatory supervisory requirements if

4    more than a small period of time is devoted to an outside entity during regular business hours." *See id.*

5         In June 2010, the Securities and Exchange Commission ("the SEC") adopted Rule 206(4)-5,

6    a.k.a. the "Pay to Play" rule.[5] *See* 17 C.F.R. § 275.206(4)-5. MSSB "modified its procedures as a result

7    of the new and heightened regulations" imposed under Rule 206(4)-5. Doc. 47-1 at 11. MSSB

8    "tightened its policies regarding political contributions[,] more critically analyzed its FAs' political

9    activities," and "issued notices and conducted trainings which Plaintiff received." *Id.* (citing Doc. 47-4,

10   Declaration of Jennifer Blake ("Blake Depo.") at ¶ 8; Doc. 48-2, Deposition of David Couch II ("Couch

11   Depo. II") at 10-14). In addition, MSSB "began asking governmental agencies to execute 'No Conflict

12   Letters' certifying that there was 'no law, rule, regulation or policy that would preclude [MSSB] or its

13   affiliates from doing business with the [entity] as a result of [the employee's] position.'" *Id.* (quoting

14   Couch Depo., Ex. 26 at 1). MSSB has executed No Conflict Letters with numerous government agencies

15   throughout the country, many of which are materially identical to one another. *See generally* Doc. 47-7,

16   Declaration of Jennifer Blake ("Blake Decl."), Ex. D.

17        In the fall of 2011, Plaintiff began campaigning for the Board position.  Doc. 47-17, Declaration

18   of Lance Horton ("Horton Decl."), at ¶ 6; Fanucchi Decl. at ¶ 8. Lance Horton, another FA at MSSB,

19   urged Plaintiff "to get formal approval from MSSB" to run for the Board position because he was

20   concerned "that MSSB may not approve [Plaintiff's] holding two full-time jobs . . . especially in light of

21   the new Pay to Play regulations." Horton Decl. at ¶ 7. Plaintiff was aware that he could not run for the

22   Board position without approval from MSSB. *See* Couch Depo., Ex. 48 at 2 (email from Plaintiff on

23   February 23, 2010, stating that "[i]n order to run [for California State Assembly] I needed to obtain

24
_____

25   [5] Rule 206(4)-5 imposed a number of new conditions on "political contributions by certain investment advisers" that the
     Court need not discuss in detail to resolve Defendants' motions. 17 CFR 275.206(4)-5. It is undisputed that the Rule applied
     to Plaintiff as an FA employed by MSSB.

approval from my employer").

In February 2012, Fanucchi directed Plaintiff to file an OBI regarding the Board position. Fanucchi Decl. at ¶ 9. On February 14, 2012, Plaintiff filed an OBI request for the Board position. Couch Depo., Ex. 21. The OBI request indicated that the Board position would require approximately 35 hours of work per week. *Id.*; Couch Depo. at 127:1-9. This "triggered inquiries from units with Morgan Stanley, including Compliance and Risk, because what [Plaintiff] proposed conflicted with MSSB's requirement that [he] work full-time as an FA . . . [and] it also created Pay to Play concerns." Fanucchi Decl. at ¶ 10.

Pursuant to Firm policy, because the County was a MSSB institutional client at the time Plaintiff ran for the Board position (and had been a client for years), UMF #16[6], "Plaintiff . . . was asked repeatedly to have Kern County execute a No Conflicts Letter confirming that his taking office [on the Board] would not bar MSSB from doing work for the County." UMF # 17-18. Plaintiff was directed "to have the County sign a letter that would confirm that, if elected, his position would create no conflict of interest between the County and Morgan Stanley, given his role as an FA at Morgan Stanley." Fanucchi Decl. at ¶ 11.

On February 21, 2012, Jennifer Blake, one of Plaintiff's superiors at MSSB, "sent [Plaintiff] a standard 'No Conflicts Letter' . . . to be completed by the government agency where he was seeking election." Blake Decl. at ¶ 6. Plaintiff did not respond. Blake followed up about the No Conflict Letter on April 24, 2012, but, again, Plaintiff did not respond. *Id.* at ¶ 10.

Plaintiff continued to campaign for the Board position until his election to the position in June 2012. UMF #21. When publicly questioned about whether he would continue to work simultaneously as

---

[6] Plaintiff claims this fact is disputed, *see* UMF #16, but MSSB's supporting evidence—including Plaintiff's deposition testimony—shows that it is not disputed credibly. Rob Hampton, MSSB's "Executive Director, Human Resources for Morgan Stanley Wealth Management," testified that the County "was an institutional client of the Firm prior to [Plaintiff's] bid for the County Supervisor position, and continues to be a Firm client." Doc. 49, Declaration of Rob Hampton ("Hampton Decl."), at ¶ 7.

1    a full-time FA and full-time Board Supervisor, Plaintiff initially suggested that his Board position could

2    be part-time. Couch Depo. at 131:9-12.

3            It is undisputed that MSSB never approved the February 2012 OBI and therefore never permitted

4    Plaintiff to run for the Supervisor position. UMF #4, 20. This was due, in part, to Plaintiff's failing to

5    obtain a No Conflicts Letter from the County, which Plaintiff ultimately never obtained. UMF # 19; *see*

6    *also* UMF #4 (Plaintiff explaining that he "was not permitted to serve as a Supervisor because Kern

7    County declined to sign the No Conflicts Letter drafted by MSSB").

8            In March 2012, Kern County Chief Administrative Officer John Nilon conferred with Kern

9    County Counsel about a draft No Conflicts Letter for Plaintiff that MSSB had requested. Doc. 62,

10   Declaration of Theresa Goldner[7] ("Goldner Decl."), at ¶ 2. In March 2012, an attorney in Kern County

11   Counsel directed Nilon not to sign the No Conflicts Letter from MSSB. *Id.* at ¶ 3. She indicated that

12   there was no rule that absolutely prohibited Plaintiff from serving on the Board while remaining at

13   MSSB under all circumstances. *Id.* at ¶ 3. She explained that, although there was a rule that generally

14   would prohibit it, some exceptions to the rule may apply. *Id.* In April 2012, Kern County Counsel

15   concluded that MSSB's No Conflicts Letter was drafted too broadly and refused to sign it. *Id.* at ¶ 4.

16           On July 26, 2012, after Plaintiff had been elected to the Board, Kern County Counsel Theresa

17   Goldner explained to Fanucchi and another unidentified MSSB employee that she "would be willing to

18   recommend that the County sign the [No Conflicts] Letter if MSSB revised" it. *Id.* at ¶ 6. An MSSB

19   representative "promised to send a revised draft of the No Conflicts Letter to address the concerns that"

20   Kern County Counsel had had with the draft. *Id.* Kern County Counsel did not receive a revised No

21   Conflicts Letter from MSSB. *Id.* at ¶ 7. Goldner requested and obtained an opinion from outside counsel

22   as to whether Plaintiff could not serve as a Supervisor while employed at MSSB. *Id.* at ¶ 8. "Nothing in

23   the opinion prompted any concern on [Goldner's] behalf" that Plaintiff could not do so. *Id.* Nonetheless,

24

25   _____

[7] MSSB's motion to strike Goldner's declaration (Doc. 66-7) is DENIED.

1    the County never executed a No Conflicts Letter for MSSB concerning Plaintiff's position as a Board

2    Supervisor. *See* Couch Depo. at 135:16-136.

3           Plaintiff was scheduled to be sworn into the Board position in January 2013. UMF #21. In

4    November 2012, various MSSB employees in different MSSB departments had discussed with one

5    another their concerns about Plaintiff's working full-time as an FA and as a full-time Board Supervisor.

6    *See* Hampton Depo. at 98:10-17; Doc. 47-18, Declaration of Bess McKay ("McKay Decl.") at ¶¶ 3-4.[8]

7    In their view, Plaintiff "could not fulfill the duties of two full-time roles at the same time and it would

8    create risk related to client service, as well as regulatory risk." McKay Decl. at ¶ 4; *see also* Doc. 47-13,

9    Declaration of Jeff Branch ("Branch Decl.") at ¶ 4. Other MSSB employees agreed. *See, e.g.*, Doc. 47-

10   19, Declaration of Michael Struckman ("Struckman Decl.") at ¶ 3; Fanucchi Decl. at ¶¶ 14, 20.

11          In December 2012, MSSB ultimately determined that Plaintiff could not serve as both a full-time

12   FA and as a full-time Board Supervisor. UMF #22; Couch Depo. at 154. On December 20, 2012, Jeff

13   Branch, Fanucchi's supervisor, participated in a phone call with Plaintiff and Fanucchi in which he

14   "communicated to [Plaintiff] that he would need to choose which full-time position he would pursue"

15   because "[h]e could not be both an FA and a full-time County Supervisor." Branch Decl. at ¶ 4; *see also*

16   Fanucchi Decl. at ¶¶ 15. Plaintiff understood that it was MSSB's opinion that he could not do both jobs

17   simultaneously, and that the Firm would not permit him to do so. Couch Depo. at 223:3-4.

18          On December 28, 2012, Plaintiff sent Fanucchi a text message that read, in part:

19         On our conference call on December 20th Jeff Branch said I needed to get back to you on the
20         28th. So…here I am. Given the choice given to me by you and Jeff (either be an FA or a
           Supervisor), the best move for me, especially financially, is to remain an FA with Morgan
21         Stanley . . . . How I break this to everyone in the next few days I haven't determined but I should
           have that figured out next week when people return to work at the County . . . . It won't be easy
22         for me and I'm gonna take a lot of grief for it. I also need to know if it's possible to get me
           enrolled in Morgan Stanley's health insurance plan. I think the deadline has passed for open

23   _____

24   [8] Counsel for Plaintiff points to an email from McKay in January 2013 in which she asks another MSSB employee for a copy
     of Plaintiff's February 2012 OBI so she could "see what info he put on the form regarding . . . the hours he would be
     working." Doc. 59-12, Klar Decl., Ex L. Counsel for Plaintiff asserts this email shows McKay did not review the February
25   2012 OBI until "January 2013, *after* MSSB threatened [Plaintiff] that if he did not resign as a Supervisor he would be
     terminated." Klar Decl. at ¶ 13. The email does not support that proposition.

                                                          7

1    enrollment. We can talk about that next week too.

2    Couch Depo., Ex. 32 at 1-4. Fanucchi understood this text message to mean that Plaintiff had chosen to

3    remain with MSSB and would not assume the Board position. Fanucchi Decl. at ¶ 15. Fanucchi

4    "promptly relayed what [she] understood to be [Plaintiff's] decision to . . . Branch." *Id.*; Branch Decl. at

5    ¶ 5; *see also* Couch Depo., Ex. 40 (email from Plaintiff to Fanucchi on January 14, 2013 stating "Dec.

6    20, 2012 is the date Morgan Stanley told me through you and Jeff Branch that I had to decide whether I

7    wanted to be a Financial Advisor at Morgan Stanley or a County Supervisor").

8          On January 7, 2013, Plaintiff was sworn into office as a Board Supervisor. UMF # 24; Couch

9    Depo., Ex. 33. During the day of January 10, 2013, Fanucchi saw Plaintiff on TV attending a press

10   conference as a County Supervisor in Taft, approximately 35 miles from Bakersfield. Doc. 48-3,

11   Deposition of Rachell Fanucchi ("Fanucchi Depo.") at 218:22-25; Couch Depo., Ex. 38; Couch Depo. at

12   166:13-167:20. MSSB again told Plaintiff that he had to decide whether he would be an FA at MSSB or

13   remain a Board Supervisor.[9] Couch Depo. at 40:4-22. On January 14, 2013, Plaintiff emailed Fanucchi,

14   stating that he had "been given an ultimatum for a second time," but did not indicate whether he would

15   choose to be solely an FA at MSSB or a Board Supervisor. Couch Depo., Ex. 40 at 1. "MSSB

16   terminated Plaintiff's employment in mid-January, 2013." UMF #26.

17                            **III. PROCEDURAL HISTORY**

18         Plaintiff filed this case on January 2, 2014. Doc. 1, Complaint ("Compl."). The Complaint

19   alleged five causes of action for (1) violations of section 1101(a); (2) violation of section 1102; (3)

20   violation of section 98.6; (4) declaratory relief under California Business & Professions Code section

21   16600 ("section 16600"); and (5) violations of California Business & Professions Code section 17200

22   ("the UCL").

23   _____

24   [9] The record does not indicate which MSSB employee(s) told Plaintiff this, but it is undisputed that he was told at some point
     between December 20, 2012 and January 14, 2013 for a second time to decide either to stay a full-time FA at MSSB or to
25   remain on the Board.

8

On April 18, 2014, the Court granted in part and denied in part MSSB's motion to dismiss Plaintiff's Complaint. Doc. 17 at 1. On May 9, 2014, Plaintiff filed the currently operative FAC, which alleges causes of action for: (1) violation of section 1101(a); (2) violation of section 1102; (3) violation of section 98.6; (4) intentional interference with existing and prospective economic relationships; (5) and negligent interference with existing and prospective economic relationships. FAC at 9-19.

Plaintiff's first cause of action for violation of section 1101(a). Section 1101(a) provides that "[n]o employer shall make, adopt, or enforce any rule, regulation or policy . . . [f]orbidding or preventing employees from engaging or participating in politics or from becoming candidates for public office." Plaintiff alleges, among other things, that MSSB's requirement that its employees execute a No Conflicts Letter "in connection with the employee's service as an elected public official . . . while employed by Morgan Stanley—or be terminated by Morgan Stanley—reflects a clear policy of Morgan Stanley that its employees must refrain from engaging or participating in politics and from becoming candidates for public office." FAC at ¶ 40. Plaintiff asserts "[t]hat policy, as applied to [Plaintiff], violates . . . § 1101(a)." *Id.*

Plaintiff's second cause of action for violation of section 1102. Section 1102 provides in full: "No employer shall coerce or influence or attempt to coerce or influence his employees through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity." Plaintiff alleges, among other things, that MSSB, "in violation of [section 1102], made clear threats to [Plaintiff] that were designed to attempt to coerce or influence [Plaintiff] through or by means of threat of discharge and loss of employment to relinquish his newly-elected position on [the Board]." FAC at ¶ 48.

Plaintiff's third cause of action for violation of section 98.6, which "provides, among other things, that no employer shall discharge or discriminate against any employee because he engaged in conduct protected under the Labor Code." *Rope v. Auto-Chlor Sys. of Wash., Inc.*, 220 Cal. App. 4th 635, 649 (2013). Plaintiff alleges, among other things, that MSSB's unlawful termination of Plaintiff

1    violated sections 1101 and 1102, which also constitutes a violation of 98.6. FAC at ¶ 56.

2          Plaintiff's fourth and fifth causes of action are for intentional interference with existing and

3    prospective economic relationships, and negligent interference with existing and prospective economic

4    relationships, respectively. FAC at 14, 17. Both claims are premised on Plaintiff's assertion that MSSB

5    wrongfully interfered with Plaintiff's relationship with the Couch Transferee Clients. *See* FAC at ¶¶ 69,

6    74. The fourth claim asserts MSSB's allegedly unlawful conduct was intentional, whereas the fifth cause

7    of action alleges that conduct was negligent.

8          In both claims, Plaintiff alleges, among other things, that "[a]t the time of [his] unlawful

9    termination . . . at least 75% of [his] client accounts were accounts that were owned or controlled by

10   Couch Client Transferees with whom [Plaintiff] had an existing economic relationship, with the

11   probability of future economic benefit to [him]." FAC at ¶¶ 62, 73.

12         In addition, both claims allege that paragraph three of the Employment Agreement, titled "Unfair

13   Competition"[10] unlawfully prohibited him from continuing his existing economic relationships with the

14   Couch Transferee Clients after his termination from MSSB. *Id.* at ¶¶ 64, 74. The Unfair Competition

15   Clause, which MSSB sometimes refers to as the "Non-Solicitation Agreement," *see* Doc. 51 at 6, reads

16   in relevant part:

17        For a period of one year following termination of employment for any reason, you will not solicit
         or attempt to solicit, directly or indirectly, any of Morgan Stanley's customers who were served
18        by you . . . while in the employ of Morgan Stanley . . . . For purposes of this provision, the term
         "solicit" includes initiation of any contact with customers for the purpose of conducting business
19        with or transferring accounts to any other person or firm that does business in any line of
         business in which Morgan Stanley or any of its affiliates is engaged . . . .
20
         For a period of one year following termination of employment for any reason, you will not,
21        directly or indirectly, recruit or solicit any employee of Morgan Stanley for employment with
         any other organization . . . .
22
     Employment Agreement, §§ 3.2-3.3.
23
           Plaintiff further alleges MSSB "caused the business and accounts of his Morgan Stanley clients,
24
     _____

25   [10] The parties interchangeably refer to the clause as "the Non-Solicit Clause" or the "Non-Compete Clause."

                                                    10

including the Couch Client Transferees, to be diverted to other financial advisors employed by Morgan

Stanley." *Id.* at ¶¶ 69, 78. Plaintiff asserts the Unfair Competition Clause constitutes a non-compete

agreement that violates California Business & Professions Code sections 16600 and 17200 ("the UCL")

and MSSB's enforcement of it "negligently interfered with [Plaintiff's] existing and prospective

economic relationship with the Couch Client Transferees and successfully misappropriated and diverted

the Couch Client Transferees to new Morgan Stanley financial advisors." FAC at ¶¶ 69, 81.

On June 9, 2014, the Magistrate Judge issued a scheduling order that provided, among other

things, that "[a]ny requested pleading amendments . . . either through a stipulation or motion to amend"

were to be filed by August 25, 2014. Doc. 28 at 3. The parties proceeded to conduct discovery.

On February 10, 2015, Plaintiff's counsel informed MSSB that "[n]ot included in the FAC are

the claims that [Plaintiff] has against [MSSB] for breach of contract, including all associated contract

claims." Doc. 51-3, Declaration of Mary C. Dollarhide ("Dollarhide Decl. 2"), Ex. B at 1. Counsel

explained:

> Consistent with the agreements between [Plaintiff] and Morgan Stanley, those claims are
> required to be submitted to FINRA for arbitration . . . . Please advise whether Morgan Stanley
> will stipulate that the . . . contract claims shall be included in a second amended complaint . . . .
> If Morgan Stanley will not so stipulate, [Plaintiff] will proceed with his contract claims before
> FINRA.

*Id.* MSSB's counsel asked to review a draft second amended complaint, but Plaintiff's counsel did not

send one until May 6, 2015. Pursuant to the Magistrate Judge's scheduling order, this was almost three

months after the close of non-expert discovery, and over seven months after the deadline for the parties

to stipulate to any further complaint amendments. *See* Doc. 28 at 3.

**B.    MSSB's Motion for Summary Judgment.**

MSSB filed its motion for summary judgment on June 5, 2015. Doc. 47. Although discussed in

more detail below, MSSB's motion boils down to its position that the Firm validly and lawfully

terminated Plaintiff for two primary reasons: (1) Plaintiff could not simultaneously perform a full-time

job as a FA at MSSB and a full-time job as a Board Supervisor and, (2) even if he could, "neither

11

1   Morgan Stanley's rules nor the rules of various state and federal regulatory agencies would allow it."

2   Doc. 47-1 at 8.

3   **C.     Plaintiff's Demand for FINRA Arbitration.**

4        Plaintiff's employment agreement contains the following arbitration clause:

5      7.  **ARBITRATION**

6      7.1 Any controversy or claim arising out of or relating to (i) your employment by Morgan
    Stanley (excluding statutory employment claims and other claims covered by Paragraph 7.2) or
7   (ii) this Agreement (or its breach), will be settled by arbitration before either the National
    Association of Securities Dealers, Inc., ("NASD") or the New York Stock Exchange, Inc.
8   ("NYSE") in accordance with their respective rules, and judgment upon an award issued by the
    arbitrator(s) may be entered in any court having jurisdiction. Except as otherwise expressly
9   agreed, any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration
    provision is to be resolved in arbitration. This paragraph will not be deemed a waiver of Morgan
10  Stanley's right to injunctive or provisional relief from any court, as provided for in this
    Agreement.

11  Couch Decl., Ex. O (Employment Agreement), at § 7.1. Section 7.2 provides:

12
13     7.2 Notwithstanding the arbitration requirement of paragraph 7.1 above, you agree that certain
    other claims (including, but not limited to, statutory discrimination and other statutory
    employment claims) must be submitted to Morgan Stanley's Alternative Dispute Resolution
14  Program, "Convenient Access to Resolutions for Employees ('CARE'). Claims required to be
    submitted to CARE are recited in the CARE Guidebook.[11]

15
16       On June 2, 2015, Plaintiff filed a claim in arbitration ("the Arbitration Claim") before a FINRA

17  panel. Doc. 51-2, Declaration of Mary Dollarhide ("Dollarhide Decl."), Ex. A ("Arb. Claim"). MSSB

18  received notice of the Arbitration Claim on June 3, 2015, two days before filing its motion for summary

19  judgment, and counsel for MSSB received the Arbitration Claim on June 11, 2015.

20       The Arbitration Claim's allegations are materially similar to the FAC's allegations, though they

21  are not identical. The Claim contains four discrete non-statutory claims for relief for (1) intentional

22  interference with existing and prospective economic relationships; (2) negligent interference with

23  existing and prospective economic relationships; (3) breach of the covenant of good faith and fair

24  dealing; and (4) fraud and deceit. Arb. Claim at 14-20.

25  [11] The Court refers to §§ 7.1 and 7.2 in the Employment Agreement collectively as "the Arbitration Clause."

1    Plaintiff's first two arbitration claims concern the same allegedly unlawful conduct of MSSB.

2    They are materially identical with the exception that the first alleges MSSB's subject conduct was

3    malicious, "intentional, willful, and calculated to cause damage to" Plaintiff, Arb. Claim at ¶¶ 52, 55,

4    whereas the second alleges that conduct "was negligent and has caused and will continue to cause

5    damage to" Plaintiff. *Id.* at ¶ 64. Both claims allege that "Morgan Stanley knew that upon [Plaintiff's]

6    termination, [his] existing economic relationships with his clients would not be continued and that

7    Morgan Stanley could cause [his] clients' accounts to be successfully diverted to [FA's] employed by

8    Morgan Stanley. *Id.* at ¶¶ 48, 60.

9    Like the fourth and fifth causes of action in the FAC, Plaintiffs' first two arbitration claims

10   allege that the Unfair Competition Clause and MSSB's enforcement of it violates the UCL. *Id.* at ¶¶ 50,

11   62. Similarly, like those causes of action in the FAC, Plaintiffs' first arbitration claim alleges that MSSB

12   intentionally and negligently "interfered with [his] existing and prospective economic relationship with

13   the Couch Client Transferees and successfully misappropriated and diverted the Couch Client

14   Transferees to new Morgan Stanley [FA's]." *Id.* at ¶ 54.

15   Plaintiff's third arbitration claim asserts MSSB "acted in breach of the implied covenant of good

16   faith and fair dealing in the [June 2007 memo] when [it] failed to timely advise [Plaintiff] that it would

17   not allow him to serve as [Board] Supervisor." *Id.* at ¶ 69. In doing so, MSSB prevented Plaintiff from

18   facilitating "the transfer of at least 75% to 80% of the accounts of clients that [he] serviced during his

19   tenure at Morgan Stanley." *Id.*

20   Plaintiff's fourth and final arbitration claim for fraud and deceit asserts that MSSB fraudulently

21   represented to Plaintiff "prior to his joining Morgan Stanley . . . that he had received [its] approval to run

22   for the [Board position] and serve in that capacity, if elected." *Id.* at ¶ 72. Specifically, Plaintiff

23   maintains that Fanucchi, who executed the June 2007 memo, knew that although MSSB approved its

24   terms, she also knew that it could be "unilaterally modified and revoked by Morgan Stanley" so Plaintiff

25   could not run for and serve on the Board, yet she "intentionally concealed" that fact. *Id.* at ¶¶ 73-74.

13

**D.    MSSB's Motion to Permanently Stay or, in the Alternative, Temporarily Enjoin the FINRA Arbitration.**

MSSB moves this Court to permanently stay (*i.e.*, permanently enjoin) or temporarily enjoin Plaintiff's FINRA arbitration proceedings because failing to do so would permit "belated amendment [of the FAC] in [this Court] or duplicative proceedings in FINRA" arbitration, both of which "would cause significant prejudice to MSSB." Doc. 51 at 10. In MSSB's view, Plaintiff's contract-based claims simply "rehash" the claims alleged "in this Court: that [MSSB] promised he could run for and serve as a [Board] Supervisor, but then would not permit him to do so simultaneous with working as a full-time [FA]." Doc. 51 at 8. As such, these claims are not new. *See id.* at 10.

MSSB argues "Plaintiff has attempted to place MSSB in a no-win situation" because in the absence of this motion, MSSB will be forced to either (1) "ask this Court to accept jurisdiction over Plaintiff's 'new' FINRA claims [under FINRA Rule 13803 ('Rule 13803')], in effect allowing Plaintiff to amend his pleadings via the back door *nearly ten months after the amendment deadline has passed*" or (2) "defend itself simultaneously in two separate fora against the same claims it has been litigating for the past 18 months." *Id.* at 9-10.

MSSB asserts that Plaintiff has waived his right to arbitrate his arbitration claims. *Id.* at 12. MSSB maintains that Plaintiff had a known right to arbitrate those claims, yet he has acted inconsistently with that right. *Id.* at 13-14. MSSB points to the fact that Plaintiff had been actively litigating this case in this Court for 18 months prior to demanding FINRA arbitration. *Id.* at 15. Thus, MSSB claims it will be prejudiced if this Court permits Plaintiff to pursue FINRA arbitration. *Id.* at 16.

Accordingly, MSSB requests that this Court permanently enjoin Plaintiff's FINRA arbitration proceedings relating because he is no longer entitled to pursue the claims he asserts in that forum. MSSB further requests that, if this Court declines to do so, then "at a minimum," this Court should "issue a preliminary injunction to temporarily enjoin the [FINRA] arbitration proceedings while" MSSB's request to permanently enjoin those proceedings "is further considered, and/or while MSSB's motion for

1  summary judgment is pending." Doc. 51 at 17-19.

2  **IV. <u>ANALYSIS</u>[12]**

3  **A.      MSSB's Motion for Summary Judgment.**

4         **1. Standard of Decision.**

5         Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any

6  affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is

7  entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the

8  outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

9  (1986). A dispute is genuine "if the evidence is such that a reasonable trier of fact could return a verdict

10 in favor of the nonmoving party." *Id.*

11        The party seeking summary judgment "always bears the initial responsibility of informing the

12 district court of the basis for its motion, and identifying those portions of the pleadings, depositions,

13 answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

14 demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

15 (1986) (internal quotation marks omitted). The exact nature of this responsibility, however, varies

16 depending on whether the issue on which summary judgment is sought is one in which the movant or the

17 nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d

18 978, 984 (9th Cir. 2007); *Cecala v. Newman*, 532 F. Supp. 2d 1118, 1132 (D. Ariz. 2007). If the movant

19 will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable

20 trier of fact could find other than for the moving party." *Soremekun*, 509 F.3d at 984. In contrast, if the

21 nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out

22 that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex*, 477 U.S.

---

[12] The parties have filed numerous evidentiary objections, motions for judicial notice, and motions to strike. *See, e.g.*, Docs. 57, 58, 66-4, 66-5. The Court will address only the facts, arguments, and motions necessary to resolve MSSB's motion for summary judgment and motion to enjoin.

15

at 323).

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in [its] favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in original). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. *Id.* at 929; *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. That remains the province of the jury or fact finder. *See Anderson*, 477 U.S. at 255. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

**2. Plaintiff's First and Second Causes of Action – Violation of sections 1101(a) and 1102**.

Section 1101(a) provides in full that "[n]o employer shall make, adopt, or enforce any rule, regulation, or policy . . . [f]orbidding or preventing employees from engaging or participating in politics or from becoming candidates for public office." Section 1102 provides in full: "No employer shall coerce or influence or attempt to coerce or influence his employees through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity."

16

1   "The California Legislature, recognizing that employers could misuse their economic power to

2   interfere with the political activities of their employees, enacted Labor Code Sections 1101 and 1102 to

3   protect the employees' rights." *Gay Law Students Ass'n v. Pac. Tel. & Tel. Co.*, 24 Cal.3d 458, 486-87

4   (1979)). "These sections are designed to protect 'the fundamental right of employees in general to

5   engage in political activity without interference by employers.'" *Nava v. Safeway, Inc.*, 2013 WL

6   3961328, at *6 (Cal. Ct. App. 2013) (quoting *Gay Law Students*, 24 Cal.3d at 487) (quotation marks

7   omitted).[13] Sections 1101 and 1102 therefore "prohibit an employer from attempting to coerce or

8   influence its employees' political activities through the threat of discharge." *Id.* at *1. The purpose of

9   sections 1101 and 1102 therefore is "to protect employees' political freedom." *Wade v. Rackauckas*,

10   2006 WL 1086259, at *4 (Cal. Ct. App. 2006). For purposes of sections 1101 and 1102, the California

11   Supreme Court explained that "[t]he term 'political activity' connotes the espousal of a candidate *or a*

12   *cause*, and some degree of action to promote the acceptance thereof by other persons." *Gay Law*

13   *Students*, 24 Cal.3d at 487 (quoting *Mallard v. Boring*, 182 Cal. App. 2d 390, 395 (1960)) (emphasis

14   original).

15   **a. MSSB Did Not Violate Section 1101(a).**

16   Plaintiff contends that MSSB's so-called "up-front assurances" policy, which required him to

17   obtain a No Conflicts Letter before MSSB would approve his serving on the Board while remaining an

18   FA at MSSB, violates section 1101(a) because it prevented him from serving on the Board. *See* Doc. 56

19   at 13-14. Plaintiff further asserts that, because there is no evidence that any actual conflict existed due to

20   his simultaneous employment at MSSB and serving on the Board, "consistent with *Eldridge* [*v. Sierra*

21   *View Local Hosp. Dist.*, 224 Cal. App. 3d 311, 318-19 (1990)], the Court should find . . . the evidence

22   shows that in connection with [Plaintiff's] termination, at a time when [he] had no actual conflicts,

---

23

24   [13] Although this is an unpublished opinion of the California Court of Appeal, *see* California Rule of Court 977(a), the Court may consider its reasoning. *See Jerry Beeman and Pharmacy Servs., Inc. v. Anthem Prescription Mgmt., LLC*, 652 F.3d 1085, 1093 (9th Cir. 2011) ("Defendants correctly argue that we are not precluded from considering these unpublished decisions as

25   a possible reflection of California law, although they have no precedential value."). Given the dearth of relevant published decisions concerning sections 1101 and 1102, the Court must resort to unpublished ones.

1    MSSB acted in violation of [section 1101(a)]." Doc. 56 at 14-15.

2          As a preliminary matter, *Eldridge*—the only authority on which Plaintiff relies—did not address

3    section 1101. As the court explicitly stated, "we do not rely upon . . . section 1101 in our analysis." 224

4    Cal. App. 3d at 317 n.2. *Eldridge* therefore provides no support for Plaintiff's position on section 1101.

5          The Court cannot find—and the parties do not provide—any case law directly on point

6    concerning section 1101(a)'s prohibition on employers having a rule, regulation, or policy that forbids or

7    prevents employees from running for or holding public office. It appears that no court has squarely

8    addressed what constitutes an impermissible "rule, regulation, or policy . . . forbidding or preventing

9    employees . . . from becoming candidates for public office."[14]

10         As a matter of plain language, the prohibition applies only to an employer's rule, regulation, or

11   policy that *necessarily* forbids or prevents an employee from running for or holding public office and

12   lacks legitimate, apolitical reasons for its implementation. An employer's rule, regulation or policy that

13   is enacted for legitimate, apolitical reasons, but has an unintended effect on an employee's ability to run

14   for or hold public office does not violate section 1101(a).

15         The purpose of the statute—to protect employees' political freedoms from their employers—and

16   the (admittedly scant) relevant case law support this proposition. Section 1101, "in essence, forbid[s]

17   employers to attempt to control the political activities of employees." *McKeon v. Mercy Healthcare*

18   *Sacramento*, 19 Cal.4th 321, 330 (1998). Its purpose is to prevent employers from "misus[ing] their

19   economic power to" do so. *Gay Law Students*, 24 Cal.3d at 486. In other words, the purpose of section

20   1101 is to prohibit employers from making decisions that adversely affect an employee (*e.g.*,

21   termination) solely because of the employer's disagreement with an employee's political viewpoints and

22   his/her expressing them, including but not limited to running for or holding public office. *See Smedley v.*

23   *Capps, Staples, Ward, Hastings & Dodson*, 820 F. Supp. 1227, 1230 n.3 (N.D. Cal. 1993) ("the courts

24   _____

25   [14] Plaintiff's claim arguably falls under section 1101(a)'s prohibition

1   have traditionally interpreted [section 1100] as being intended to defend employees engaged in

2   traditional political activity from reprisal by their employer").

3   Section 1101 is not intended to prohibit an employer's rule, regulation, or policy that is enacted for

4   wholly apolitical reasons that may, when enforced, infringe on an employee's ability to express his or

5   her political viewpoints.

6          Although not entirely on point, *Nava* illustrates this principle well. In that case, the plaintiff, an

7   employee of Safeway, was fired for tearing down and throwing out a poster in the store "announcing

8   that June 2009 was 'GAY/LESBIAN PRIDE MONTH.'" *See Nava*, 2013 WL 3961328, at *1-2. The

9   plaintiff explained that he tore down the poster because "he was 'extremely bothered' by the political

10  agenda Safeway was apparently promoting (i.e., same-sex marriage)." *Id.* at *2. The plaintiff's managers

11  "express[ed] 'disapproval of [p]laintiff's position.'" *Id.* The plaintiff was terminated a week later, and

12  alleged it was "'because he objected to Safeway's policy of seeking to have its employees and customers

13  support the gay/lesbian political agenda.'" *Id.* The plaintiff sued for, among other things, violating

14  section 1101. *Id.* at *2. The trial court sustained Safeway's demurrer, finding that "the lawsuit arose out

15  of protected activities." *Id.* at *4.

16         The Court of Appeal reversed. *Id.* at *1. In the court's view, the "key question" in the case was

17  whether the plaintiff was fired because of his "personal political views and advocating relating to . . .

18  same-sex marriage" or whether he was "fired for removing and disposing of Safeway's poster." *Id.* at

19  *7. The court explained that, if the plaintiff was fired simply for tearing down the poster, Safeway's

20  terminating him was justified because "he was, in effect, interfering with Safeway's right to free

21  expression" and impermissibly "tamper[ed] with [and] dispos[ed] of company property." *Id.* The court

22  emphasized that "[t]he important thing here is that *if that was the reason for plaintiff's termination*, it

23  would not constitute a violation of Labor Code sections 1101 or 1102." *Id.* (emphasis in original)

24  (footnote omitted).

25         But, "[o]n the other hand, it is possible under the [plaintiff's] allegations that the poster incident

was not the real reason for [his] termination." *Id.* at *8. "Under th[o]se allegations . . . one theory of

plaintiff's case was that he was fired because of the political perspective or cause that he identified with

and espoused in his discussion with Safeway's managers." *Id.* The court therefore found that the

plaintiff had stated a claim for wrongful termination in violation of sections 1101 and 1102. The court

reasoned:

> If plaintiff was fired for his particular political perspective, affiliation or cause . . . so that it may
> be inferred that (as plaintiff alleged) Safeway was in effect declaring that the espousal or
> advocacy of such political views will not be tolerated—then Safeway's actions constituted a
> violation of Labor Code sections 1101 and 1102.

*Id.* (emphasis in original) (footnote and citations omitted).

   *Ali v. L.A. Focus Pub.*, 112 Cal. App. 4th 1477 (2003), *disapproved of on other grounds*, *Reid v.

Google, Inc.*, 50 Cal.4th 512 (2010), is analogous. In *Ali*, the plaintiff, a writer for the defendant-

newspaper, was terminated approximately one week after he criticized a Congresswoman on public

radio for her support of a particular political candidate. *Id.* at 1481. The plaintiff's manager told him

that, "to appease [the Congresswoman], he had 'no choice' but to fire" the plaintiff. *Id.* The plaintiff

sued the newspaper for wrongful termination in violation of public policy, among other things. *Id.* The

trial court granted the newspaper's motion for summary judgment in which the newspaper argued,

among other things, that "it was entitled to terminate its relationship with [the plaintiff] for speaking in a

manner that contravened the editorial policy of the paper and, therefore, [the plaintiff] failed to set forth

any public policy violated by his discharge." *Id.* at 1483, 1486-87.

   The Court of Appeal reversed. *Id.* at 1486. The court rejected the newspaper's suggestion that "it

ha[d] the unfettered right to terminate an employee for any speech or conduct that is inconsistent with

[its] editorial policies." *Id.* at 1488. The court explained that section 1101 reflects California's "public

policy prohibiting employers from terminating an employee for engaging in political activity." *Id.* at

1487. The court then went on to explain that, contrary to the newspaper's characterization of his claim,

the plaintiff "assert[ed] he was fired not because the content of his articles contravened the editorial

1   policies or standards of the newspaper, but because outside of the workplace he publicly criticized an

2   influential public official for supporting a particular political candidate." *Id.* In the court's view, the

3   plaintiff "submitted sufficient evidence of a public policy violation to survive a motion for summary

4   judgment." *Id.* (footnote omitted).

5          Both *Nava* and *Ali* stand for the straightforward proposition that an employer cannot terminate its

6   employee solely for expressing his/her political viewpoints or disagreeing with an employee's political

7   viewpoint. But, as *Nava* illustrates, an employee's political expression nonetheless may provide

8   legitimate alternative grounds for termination. As the Court of Appeal explained in *Nava*, although an

9   employer violates section 1101for terminating an employee for expressing political disagreement with

10  the employer's views, an employer does not violate section 1101 for terminating an employee who

11  expresses his/her political disagreement via destroying company property. Similarly, an employer

12  potentially would violate section 1101 for terminating its employee for participating in a political rally

13  for a political candidate when that employee is off duty because the employer did not prefer the political

14  candidate. But an employer certainly would not violate section 1101 for terminating a full-time

15  employee who joined a political candidate's campaign as a full-time employee if doing so meant the

16  employee could not hold two full-time jobs.

17         Likewise, here, if MSSB terminated (or threatened to terminate) Plaintiff solely due to his

18  pursuing outside-of-work political activity that had no bearing on his workplace performance solely

19  because the Firm disagreed with the politics of that activity, the Firm would have violated section

20  1101(a). But there is simply no evidence of a political motivation underpinning either MSSB's

21  threatening to terminate or ultimately terminating Plaintiff. Rather, a number of undisputed facts

22  establish that MSSB had legitimate, apolitical reasons for doing so—namely, that the Board position

23  was full-time and created potential conflicts of interest.

24         First, MSSB permitted Plaintiff to serve on the City Council for over five years while at MSSB.

25  MSSB also permitted Plaintiff to serve on the boards of various public organizations while at MSSB.

21

1   Plaintiff was required to execute a No Conflicts Letter for these positions that was materially identical to

2   the one he was required to execute for the Board position—a non-partisan County office. All of these No

3   Conflict Letters were apolitical; they only required verification that Plaintiff's assuming the positions

4   would not create any impermissible conflicts of interest and would not violate any applicable laws.

5   Simply put, MSSB required Plaintiff to execute a No Conflict Letter with the County only to ensure that

6   his becoming a Board Supervisor would not violate the law and would not preclude the Firm from

7   maintaining its business relationship with the County.[15] There is no evidence that MSSB attempted to

8   control, direct, or otherwise affect Plaintiff's outside-of-work political activity in any way. As Plaintiff

9   testified, no one at MSSB "ever attempted to influence [his] political position on any issue." Couch

10   Depo. at 177:10-18.

11          Plaintiff essentially argues that MSSB's No Conflicts Letter policy violates section 1101 because

12   if he did not execute a No Conflicts Letter with the County, then MSSB would not permit him to serve

13   on the Board while also serving at MSSB. As explained above, MSSB had legitimate, apolitical reasons

14   for requiring a No Conflicts Letter, and accepting Plaintiff's argument that MSSB's No Conflicts Letter

15   policy violates section 1101 would lead to absurd results. Under Plaintiff's logic, MSSB would violate

16   section 1101 unless the Firm gave him carte blanche to run for and hold any political position while

17   keeping his FA job, regardless of the potential conflicts of interest or regulatory compliance issues

18   caused by his holding the position. Plaintiff does not provide—and the Court cannot find—any authority

19   that remotely suggests Plaintiff's understanding of section 1101 is correct.

20          The Court therefore finds that no genuine issue of material fact exists as to whether MSSB

21   violated section 1101. Accordingly, the Court GRANTS MSSB's motion for summary judgment on

22   Plaintiff's first claim for violation of section 1101 in MSSB's favor and against Plaintiff.

23   _____

24   [15] It is not relevant whether *actual* conflicts of interest between MSSB and the County arose due to Plaintiff's assuming the
     Board position. Given that the County was a MSSB client at all relevant times, the Firm reasonably believed Plaintiff serving
     as a County Supervisor could create a conflict of interest between MSSB and the County that would preclude them from
25   lawfully maintaining a business relationship, at least in the absence of a No Conflict Letter.

1

**b. MSSB Did Not Violate Section 1102.**

2      Section 1102, a statute interrelated to section 1101, *see McKeon*, 19 Cal.4th at 330, "prohibit[s]

3   discharge of employees for refusing to follow 'any particular course or line of political action or political

4   activity.'" *Thunderburk v. United Food & Commercial Workers' Union*, 92 Cal. App. 4th 1332, 1344

5   (2001) (quoting section 1102)). Like section 1101, section 1102 is intended "to protect 'the fundamental

6   right of employees in general to engage in political activity without interference by employers.'" *Gay*

7   *Law Students*, 24 Cal.3d at 610 (quoting *Fort v. Civil Serv. Commission*, 61 Cal.2d 331, 335 (1964)).

8      Plaintiff suggests section 1102 provides an unqualified prohibition on employers from

9   threatening to terminate or actually terminating an employee due to his/her political activity, regardless

10   of how it may affect the employer. *See* Doc. 56 at 15. According to Plaintiff's logic, an employer

11   necessarily violates section 1102 if it terminates (or threatens to terminate) an employee for his/her

12   conduct, so long as that conduct constitutes political activity. For instance, under that logic, an employer

13   would violate section 1102 for terminating (or threatening to terminate) an employee who impermissibly

14   misses work to participate in political activity during scheduled work hours. Plaintiff's interpretation of

15   section 1102, like his interpretation of section 1101, has no merit.

16      The limited case law interpreting section 1102 indicates that, similar to section 1101, section

17   1102 prohibits an employer from attempting to control its employees' political activity "through . . .

18   threat of discharge or loss of employment" *for political reasons*. *Gay Law Students*, 24 Cal.3d 458, is

19   the only binding authority directly on point of which the Court is aware. In that case, individuals and gay

20   rights organizations brought suit against the defendant-telephone company in which they alleged, among

21   other things, the defendant "discriminat[ed] against homosexuals in the hiring, firing and promoting of

22   employees," in violation of section 1102. *Id.* at 464.[16] The California Supreme Court found that the

23   plaintiffs' allegations that the defendant "discriminates in particular against . . . homosexual[s],

24   _____

25   [16] The Court need not discuss the nuanced factual and procedural history of *Gay Law Students*.

1   [individuals] who defend homosexuality, or who are identified with activist homosexual organizations"

2   stated a claim for violation of section 1102. *Id.* at 488.

3       As Plaintiff testified, MSSB never attempted to influence or alter his politics or his political

4   activities. And as explained above, the undisputed evidence establishes that MSSB threatened to

5   terminate and ultimately did terminate Plaintiff because (1) he failed to obtain a No Conflicts Letter

6   from the County and (2) the Board position was full-time.[17] To MSSB, "[i]t did not matter if Plaintiff

7   wanted to work at the White House or at White Castle" because he could not adequately fulfill his duties

8   to the Firm if he took another full-time job, such as a Board Supervisor. Doc. 47-1 at 21. In sum, MSSB

9   did not discharge (or threaten to discharge) Plaintiff for political reasons; its reasons were wholly

10  apolitical.

11      The Court therefore finds that no genuine issue of material fact exists as to whether MSSB

12  violated section 1102. Accordingly, the Court GRANTS MSSB's motion for summary judgment on

13  Plaintiff's second cause of action for violation of section 1102 in MSSB's favor and against Plaintiff.[18]

14      **3. MSSB Did Not Violate Section 98.6**.

15      "[S]ection 98.6 provides, among other things, that no employer shall discharge or discriminate

16  against any employee because he engaged in conduct protected under the Labor Code." *Rope v. Auto-*

17  *Chlor Sys. Of Wash., Inc.*, 220 Cal. App. 4th 635, 649 (2013). Thus, section 98.6 only "prohibit[s]

18  terminations for conduct 'otherwise protected by the Labor Code.'" *Grinzi v. San Diego Hospice Corp.*,

19  120 Cal. App. 4th 72, 87 (2004).

20      Plaintiff claims MSSB "unlawfully terminated [him] because he engaged in conduct protected by

21  [sections] 1101 and 1102," FAC at ¶ 56, and, in doing so, MSSB also violated section 98.6. *See id.* at ¶¶

22  _____

23  [17] MSSB claims that by November 2012, the Firm "had focused [its] attention on the hours conflict presented by Plaintiff's
24  request that MSSB allow him to work a second full-time job," Doc. 66 at 3, but the evidence cited does not support MSSB's
    contention. *See* Hampton Depo. at 98:10-17.

25  [18] Because Plaintiff's request for punitive damages is based on his section 1102 claim, *see* Doc. 56 at 30, the Court also
    GRANTS MSSB's motion for summary judgment on Plaintiff's punitive damages claim.

1  57-58; *see also* Doc. 56 at 17. Plaintiff therefore asserts he is entitled to various damages under section

2  98.6. *See id.* at ¶¶ 57, 59.

3       As explained above, the undisputed evidence establishes that MSSB did not terminate Plaintiff

4  due to his engaging in conduct protected by the Labor Code (*i.e.*, sections 1101 and 1102). Rather, his

5  employment was terminated because multiple MSSB employees concluded Plaintiff "could not fulfill

6  his full-time obligations to MSSB clients if he was dedicating at least 35 hours each week—25 hours

7  during business hours—to another job." Doc. 66 at 3. Accordingly, the Court GRANTS MSSB's motion

8  for summary judgment on Plaintiff's section 98.6 claim in MSSB's favor and against Plaintiff.[19]

9  **4. Plaintiff's Claims for Interference With Prospective Economic Advantage Fail.[20]**

10       Plaintiff's fourth and fifth causes of action are for intentional and negligent interference with

11  prospective economic relationships, respectively (collectively, "the interference claims").

12       **a. Standards.**

13       To establish a claim for intentional interference with prospective economic advantage, Plaintiff

14  has the burden to prove the following elements: (1) an economic relationship between Plaintiff and a

15  third party, with the probability of future economic benefit to Plaintiff; (2) MSSB's knowledge of the

16  relationship; (3) an intentional act by MSSB, designed to disrupt the relationship; (4) actual disruption of

17  the relationship; and (5) economic harm to Plaintiff proximately caused by MSSB's wrongful act. *Korea*

18  *Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1153-54 (2003). In addition,

19      [t]he intentional act must be "independently wrongful," *i.e.*, wrongful by some measure beyond

20      the fact of the interference itself. In other words, the act must be proscribed by some
    constitutional, statutory, regulatory, common law, or other determinable standard, rather than
    merely be a product of an improper, but lawful, purpose or motive and must be "independently

21      actionable." The plaintiff need not prove that the defendant acted with the specific intent or

22  ────────────────

23  [19] Because Plaintiff's first three causes of action fail as a matter of law, the Court need not address MSSB's alternative arguments that federal law preempts those claims and that MSSB would have terminated him regardless based on "after-acquired evidence." *See* Doc. 47-1 at 21-25, 30.

24  [20] MSSB apparently misconstrued Plaintiff's interference claims to be based, in part, on alleged interference with contractual relations. *See* Doc. 47-1 at 25-26. But Plaintiff clarified in his opposition that he is not asserting any contract-based

25  interference claim. *See* Doc. 56 at 22-23.

purpose of disrupting the plaintiff's prospective economic advantage, as long as the defendant knew the interference was certain or substantially certain to occur as a result of its action.

*Edwards v. Arthur Andersen LLP*, 47 Cal. Rptr. 3d 788, 794-95 (2006) (citations and quotation marks omitted), *rev'd on other grounds*, 44 Cal.4th 937 (2008). This is so because "[t]he tort of intentional interference with prospective economic advantage is not intended to punish individuals or commercial entities for their choice of commercial relationships or their pursuit of commercial objectives." *Korea Supply*, 29 Cal.4th at 1158-59.

A claim for negligent interference with prospective economic advantage contains the same elements, except the defendant's conduct is alleged to be negligent, not intentional.[21] *See Crown Imports, LLC v. Superior Court*, 223 Cal. App. 4th 1395, 1404 n.10 (2014) ("The difference between intentional interference and negligent interference with prospective economic advantage relates to the defendant's intent."). "For negligent interference, wrongful conduct as defined by *Korea Supply* is still required . . . . But in place of the intentional conduct requirement, the plaintiff must show that the defendant owed the plaintiff a duty of care which was breached by the defendant's negligent conduct." *Impeva Labs, Inc. v. Sys. Planning Corp.*, No. 12-cv-125, 2012 WL 3647716, at *6 (N.D. Cal. 2012) (citation and footnote omitted); *see also Lange v. TIG Ins. Co.*, 68 Cal. App. 4th 1179, 1187 (1998) (same).

### b. The Parties' Contentions.

The interference claims assert that: (1) MSSB terminated Plaintiff in violation of sections 1101(a), 1102, and 98.6; (2) the Non-Solicit Clause is void and unenforceable because it violates the UCL; and (3) MSSB's unlawful termination of Plaintiff and its enforcement of the Non-Solicit Clause impermissibly interfered with Plaintiff's relationships with the Couch Client Transferees, thereby causing him to suffer continuing economic damages. *See* FAC at ¶¶ 61-81.

---

[21] Because the Court need not address the intent element, the Court's analysis below applies to both of Plaintiff's interference claims.

26

MSSB moves for summary judgment on both claims on the grounds (1) "Plaintiff cannot make out the first, fourth and fifth prongs of the analysis because the existence of any economic relationship resulting in a future benefit, as well as actual disruption and economic harm, are all entirely speculative," Doc. 47-1 at 26 (citations omitted), and (2) "even if Plaintiff could prove damage, none is attributable to wrongful conduct by MSSB." *Id.* at 28 (emphasis omitted). In addition, MSSB argues in its reply that "the now defunct Non Solicit Clause does not establish wrongdoing," and, in any event, "Plaintiff offers no evidence of actual disruption." Doc. 66 at 9-10 (emphasis omitted).[22]

### c. Analysis.

As discussed above, Plaintiff's claims that MSSB's terminating him violated sections 1101(a), 1102, and 98.6 lack merit. Those claims and their underlying factual allegations therefore do not constitute "independently wrongful conduct" that would support Plaintiff's interference claims. That leaves Plaintiff's argument that MSSB's use of the Non-Solicit Clause was independently wrongful conduct.[23]

### (1) Use of the Non-Solicit Clause.

Citing *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937 (2008), Plaintiff asserts MSSB's use of the Non-Solicit Clause in the Employment Agreement violates California Business and Professions Code sections 16600 and 17200 ("the UCL"), and therefore constitutes "wrongful conduct" sufficient to support the interference claims.

---

[22] In its reply, MSSB argues Plaintiff's interference claims fail because they require a contractual relationship, yet Plaintiff contends he had no contract with his clients at MSSB. *See* Doc. 66 at 8 n.7. MSSB is incorrect. *See Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990) ("interference with prospective advantage does not require proof of a legally binding contract").

[23] Plaintiff suggests that a number of other things MSSB did before and after he was terminated interfered with his MSSB client relationships and caused him economic harm. For instance, Plaintiff argues that MSSB could have: (1) given him more notice prior to terminating him so that he could have had "sufficient time to find a new firm so he could attempt to transfer his clients and continue to service their business," Doc. 56 at 26; (2) given him "access to the MSSB computers with his current client information" before shutting off his access without notice, *id.*; and (3) assured him that the Firm would not enforce the Non-Solicit Clause. *Id.* But Plaintiff does not assert that any of these actions were "independently wrongful," nor does he provide any authority that would support a finding that they were. As such, they cannot provide the basis for Plaintiff's interference claims. *See Korea Supply*, 29 Cal.4th at 1158-59 (requiring that actions must be "independently wrongful" to support an interference claim).

(a)    **MSSB's Article III Standing Challenge.**

MSSB contends Plaintiff lacks Article III standing to pursue a claim premised on the Non-Solicit Clause because of the Court's order dismissing Plaintiff's fourth cause of action for declaratory relief asserted in his original complaint. *See* Doc. 47-1 at 28. In addition, MSSB argues that, at the time Plaintiff signed the Employment Agreement (2007), the Non-Solicit Clause was legal under then-existing precedent (*i.e.*, pre-*Edwards* precedent). *Id.* MSSB further argues that, regardless of whether the Non-Solicit Clause is void and unenforceable, MSSB never attempted to enforce it. *Id.*; Doc. 66 at 9.

To support its argument that Plaintiff lacks Article III standing to assert any claim premised on the Non-Solicit Clause, MSSB points to the Court's conclusion that "the Non-Solicit Clause has expired and poses no threat of future harm" in the Court's order dismissing Plaintiff's original complaint. Doc. 47-1 at 18 (quoting Doc. 17 at 10). Plaintiff's declaratory judgment claim sought a declaration from the Court that the Non-Solicit Clause is void and unenforceable. Doc. 17 at 9. The Court concluded Plaintiff could not pursue that claim because, by its own terms, the Non-Solicit Clause already had expired by the time Plaintiff brought this case and "there [was] nothing to suggest that the Non-Compete Clause [would] ever become effective again." *Id.* at 10. Thus, the Court concluded Plaintiff did not have Article III standing to pursue *his declaratory relief claim* that the Non-Solicit Clause was unenforceable because it was no longer in effect and, accordingly, could not possibly cause Plaintiff any *further* injury. *Id.* Because the Non-Solicit Clause had expired by its own terms and MSSB was not attempting to enforce it contrary to its terms, the Court could not order any declaratory relief because there was no threat of harm to Plaintiff.[24]

The Court's holding, however, was limited expressly to Plaintiff's declaratory relief claim only and has no bearing on whether Plaintiff has Article III standing to pursue his interference claims. Because the interference claims are premised, in part, on *past* injuries Plaintiff allegedly already

---

[24] This result would have been different if, for instance, MSSB was attempting to enforce the Non-Solicit Clause in spite of its clear expiration.

1    incurred as a result of the Non-Solicit Clause, he has Article III standing to pursue them.

2              (b)     **MSSB's Argument That the Non-Solicit Clause Was Legal in
                       2007.**

3        MSSB is correct that the Non-Solicit Clause may have been legal in 2007 prior to *Edwards* under

4    then-existing Ninth Circuit precedent. But MSSB, in effect, does not dispute Plaintiff's contention that

5    the Non-Solicit Clause is unlawful under *Edwards*. *See* Doc. 66 at 9.

6         In *Edwards*, the California Supreme Court held that non-compete agreements, such as the Non-

7    Solicit clause, are invalid under section 16600. 44 Cal.4th at 955. As the court explained, the Ninth

8    Circuit had created the "narrow-restraint" exception to claims alleging a non-compete or non-solicit

9    clause violated section 16600. 44 Cal.4th at 948 (discussing *Campbell v. Trustees of Leland Stanford Jr.*

10   *Univ.*, 817 F.2d 499 (9th Cir. 1987)). The Ninth Circuit concluded that section 16600 "only makes

11   illegal those restraints which preclude one from engaging in a lawful profession, trade, or business," and

12   thus held that non-compete clauses that placed only a small or limited restriction on an employee's

13   ability to pursue his/her profession did not violate section 16600. *Id.*; *Campbell*, 817 F.2d at 502.

14       But, as MSSB acknowledges, *Edwards* explicitly rejected the narrow restraint exception. *Id.* at

15   948-50, 955. Since *Edwards*, the California courts have made clear that section 16600 provides an

16   across-the-board prohibition on non-solicit clauses, unless one of the limited statutory exceptions

17   applies. *See, e.g.*, *Retirement Group v. Galante*, 176 Cal. App. 4th 1226, 1241 (2009); *Silguero v.*

18   *Creteguard, Inc.*, 187 Cal. App. 4th 60, 66-67 (2010); *Dowell*, 179 Cal. App. 4th 564, 574-75 (2009). In

19   other words, the Ninth Circuit's "narrow-restraint" exception is no longer applicable after *Edwards*.

20       MSSB suggests that the Non-Solicit Clause remains lawful under the Ninth Circuit's narrow

21   restraint exception, which applies because the Employment Agreement was entered into in 2007, before

22   *Edwards* was issued. *See* doc. 66 at 9. The Court cannot find—and MSSB does not provide—any

23   authority to support its suggestion that a non-compete clause entered into pre-*Edwards* remains lawful

24   even though it is unlawful post-*Edwards*.

25

                                                 29

1    MSSB also argues that its use of the Non-Solicit Clause was lawful because it is undisputed the

2   Firm never attempted to enforce it. *See* Doc. 47-1 at 28; Doc. 66 at 9. Again, the Court cannot find—and

3   MSSB does not provide—any authority to support its suggestion that an otherwise unlawful Non-Solicit

4   Clause is lawful simply because it is not enforced.

5    The somewhat limited case law on the issue supports Plaintiff's position that MSSB's placing the

6   Non-Solicit Clause in the Employment Agreement is unlawful in and of itself, regardless of whether

7   MSSB attempted to enforce it. In *Applied Materials, Inc. v. Advanced Micro-Fabrication Equip.*

8   *(Shanghai) Co.*, 630 F. Supp. 2d 1084, 1092 (N.D. Cal. May 20, 2009), the district court found that

9   because the subject non-compete clause "is unlawful under section 16600, it follows that [it] constitutes

10  unfair competition under section 17200." Although the plaintiff attempted to enforce the non-compete

11  clause with its law suit, the court focused only on the terms of the clause itself and found that, on its

12  face, the clause violated section 16600. *See id.* at 1090-91.

13   Similarly, the California Court of Appeal explicitly held that non-compete clauses materially

14  similar to the Non-Solicit Clause were "void and unenforceable under section 16600 and . . . their *use*

15  violates section 17200." *Dowell v. Biosense Webster, Inc.*, 179 Cal. App. 4th 564, 575 (2009) (emphasis

16  added).[25] The court held that "[h]aving properly determined that the clauses were facially void under

17  section 16600, the trial court was not required to undertake any further analysis." *Id.* at 579. And in

18  *Application Group, Inc. v. Hunter Group, Inc.*, 61 Cal. App. 4th 881, 907-08 (1998), the Court of

19  Appeal affirmed the trial court's conclusion that the defendant's use of an unlawful non-compete clause

20  in its employee contracts constitutes unfair competition in violation of section 17200.

21   The Court concludes that MSSB's use of the Non-Compete Clause was unlawful under

22  California law and suffices as wrongful conduct to support Plaintiff's interference claims. That MSSB

23  _____

24  [25] Although the defendants in *Dowell* attempted to enforce the subject non-compete clauses against the plaintiffs, the court noted that non-compete clauses may be facially invalid in that they violate section 16600. *See* 179 Cal. App. 4th at 579 (citing, among other cases, *Latona v. Aetna U.S. Healthcare, Inc.*, 82 F. Supp. 2d 1089, 1093 (C.D. Cal. 1999) (finding that

25  non-compete clause "on its face . . . [is] in clear derogation of section 16600").

30

1   did not attempt to enforce them does not change this result. Although one party attempted to enforce the

2   subject non-compete clauses in *Dowell* and *Application Group*, the courts held that simply placing the

3   non-compete clauses in the subject contracts was unfair competition that violated section 17200.

### (2) Plaintiff's Damages Are Speculative.

5   MSSB moves for summary judgment on Plaintiff's interference claims, in part, because "there is

6   no economic harm attributable to MSSB" and, in any event, any alleged economic harm is "entirely

7   speculative." Doc. 47-1 at 26. The thrust of MSSB's assertion that Plaintiff's claimed damages are

8   speculative is that his earnings at MSSB were premised, in part, on client portfolios, the performance of

9   which is uncertain. *See* Doc. 47-1 at 27, *id.* at 27 n.36. As MSSB explains, "Plaintiff's compensation

10  was derived, at least in part, on the size of the portfolios he managed. But Morgan Stanley customers

11  can add or remove assets as they wish, and their reasons for doing so are infinitely varied and not

12  necessarily dependent on the service of the FA." *Id.* at 27 n.36.

13  Plaintiff asserts MSSB's use of the Non-Solicit Clause violated the UCL and interfered with his

14  MSSB client relationships. Doc. 56 at 24. Plaintiff relies primarily on his own declaration testimony to

15  support his claim that any of his client relationships actually were disrupted by the Non-Solicit Clause.

16  *See id.* [26] Plaintiff also points to Nolte's report as proof that his damages are not speculative.        Even

---

18  [26] MSSB moves to strike portions of Plaintiff's declaration on the ground they are inconsistent with his deposition testimony.
    *See* Doc. 66-3 at 41-44. Although MSSB does not invoke or reference the rule, MSSB's motion to strike is governed by the
19  so-called "sham affidavit rule." That "general rule" provides "that a party cannot create an issue of fact by an affidavit
    contradicting his prior deposition testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (citation and quotation
20  marks omitted). Thus, the "sham affidavit rule prevents 'a party who has been examined at length on deposition' from
    'rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony,' which 'would greatly
21  diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" *Id.* (quoting *Kennedy v.
    Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991)).
22          Because the sham affidavit rule must be applied cautiously, the Court "must make a factual determination that the
    contradiction is a sham, and the 'inconsistency between a party's deposition testimony and subsequent affidavit must be *clear
    and unambiguous* to justify striking the affidavit.'" *Id.* (quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998-99 (9th
23  Cir. 2009) (emphasis added)). Accordingly, a party whose declaration is being challenged as a sham "may explain or attempt
    to resolve contradictions with an explanation that is sufficiently reasonable." *Yeager*, 693 F.3d at 1081 (discussing *Cleveland
24  v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806-07 (1999)). "[T]he non-moving party is not precluded from elaborating upon,
    explaining or clarifying prior testimony elicited by opposing counsel on deposition and minor inconsistencies that result from
    an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Van
25  Asdale*, 577 F.3d at 999 (citation and quotation marks omitted).
            Here, Plaintiff's deposition testimony is not clearly and unambiguously inconsistent with his declaration testimony.

1    assuming MSSB's use of the Non-Solicit Clause actually disrupted his client relationships, Plaintiff still

2    bears the burden of proving that he suffered economic harm as a result of that disruption. *See Korea*

3    *Supply*, 29 Cal.4th at 1165; *Pardi v. Kaiser Found. Hospitals*, 389 F.3d 840, 852 (9th Cir. 2004). ) "The

4    law precludes recovery for overly speculative expectancies by initially requiring proof the business

5    relationship contained 'the *probability* of future economic benefit to the plaintiff.'" *Westside Ctr.*, 42

6    Cal. App. 4th at 803 (quoting *Youst*, 43 Cal.3d at 71) (emphasis in original). Thus, "as a matter of law, a

7    threshold causation requirement exists for maintaining a cause of action for either [negligent or

8    intentional interference], namely, proof that it is reasonably probable that the lost economic advantage

9    would have been realized but for the defendant'' interference." *N. Am. Chem. Co. v. Superior Court*, 59

10   Cal. App. 4th 767, 786 (1997); *see also Youst*, 43 Cal.3d at 71. The Ninth Circuit has interpreted this to

11   mean that but for the defendant's interference, the plaintiff more likely than not would have obtained the

12   future economic benefit the plaintiff's claimed damages. *See Pardi*, 389 F.3d at 852.

13          As noted, Plaintiff only points to his declaration and Nolte's report to support his assertion that

14   the Non-Solicit Clause caused him economic harm. With regard to his declaration, Plaintiff only points

15   to paragraphs 28 and 29 to support the assertion that MSSB's use of the Non-Solicit Clause caused him

16   economic harm. *See* Doc. 56 at 24-26 (citing Couch Decl. at ¶¶ 28-29). Neither of these portions of

17   Plaintiff's declaration even purports to provide any specific evidence of economic harm that Plaintiff

18   suffered as a result of his alleged compliance with the Non-Solicit Clause.

19          That leaves Nolte's report, which Plaintiff argues proves that his damages are not speculative.

20   *See* Doc. 56 at 23-24. But Nolte's report makes no mention of the Non-Solicit Clause and thus does not

---

22   In the latter, he stated that he did not communicate with the clients he served while at MSSB for "many months" after his
     termination. Couch Decl. at ¶ 28. Plaintiff does not explain in his declaration whether and when he re-initiated contact with
23   his clients. *See id.* In his deposition, Plaintiff acknowledged that at least a few of his MSSB clients transferred with him to his
     new firm, Couch Depo. at 194:1-13, but Plaintiff did not testify as to *when* those clients transferred. Nonetheless, it is
     undisputed that he transferred those clients "months after [he] was terminated." *See* UMF #39. Plaintiff's deposition
24   testimony therefore is plausibly consistent with his declaration testimony that he did not communicate with or move his
     MSSB clients for "many months" after his termination. Accordingly, the Court DENIES MSSB's motion to strike Plaintiff's
25   testimony contained in paragraphs 28 and 29 of his declaration.

1    attempt to show a causal nexus between Plaintiff's compliance with the Clause and his claimed

2    damages. It does not explain or discuss any specific client account that was disrupted because of the

3    Non-Solicit Clause and Plaintiff's compliance with it. The report only attempts to establish what

4    Plaintiff would have earned from MSSB but for his termination. *See, e.g.*, Nolte Report at 9, Table 4.A

5    ("'But-For' Earnings").

6         Plaintiff provides no explanation of how Nolte's report or his declaration provide evidence of a

7    causal nexus between the Non-Solicit Clause and his economic damages. For instance, Plaintiff does not

8    provide any evidence of a client account that went south, was lost, or otherwise was disrupted during the

9    "many months" in which he did not interact with his clients. Nor does he provide any evidence of a

10   transaction that would have transpired but for his compliance with the Non-Solicit Clause. Plaintiff does

11   no more than assert that he was terminated, he abided by Non-Solicit Clause, and he then suffered

12   economic harm. This is not evidence of a cause and effect relationship between the Non-Solicit Clause

13   and Plaintiff's damages. *See Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 393-94 (2004)

14   ("With respect to causation, '[m]ore than *post hoc*, *ergo propter hoc* must be demonstrated.'") (citation

15   omitted). Simply put, Plaintiff has failed to present *any* evidence showing that the Non-Solicit Clause

16   caused him to suffer economic harm. As the record currently stands, Plaintiff's claimed damages are

17   linked only to his termination, which the Court concludes was entirely lawful, and therefore cannot

18   provide Plaintiff a foundation for his interference claims.

19        Because Plaintiff bears the ultimate burden of proof on his interference claims, *see Korea*

20   *Supply*, 29 Cal.4th at 1165, the Court can grant MSSB summary judgment based on its argument that

21   Plaintiff has no evidence to support the claims. *See Soremekun*, 509 F.3d at 984 (citing *Celotex*, 477

22   U.S. at 323). Plaintiff's failure to establish the causation element of its interference claims means those

23   claims cannot survive summary judgment. *See id.*; *Liberty Lobby*, 477 U.S. at 250-52; *Dynamic Details*,

24   116 Cal. App. 4th at 394. Accordingly, the Court GRANTS MSSB's motion for summary judgment on

25

1    Plaintiff's interference claims in MSSB's favor and against Plaintiff. [27]

2    **B. MSSB's Motion to Permanently Enjoin the FINRA Arbitration Proceedings.[28]**

3          MSSB requests that the Court permanently enjoin Plaintiff's FINRA arbitration proceedings.

4    Doc. 51 at 11. MSSB asserts the Court should do so because Plaintiff has waived his right to arbitrate

5    his claims before the FINRA panel. *Id.*

6          Neither of the parties sufficiently briefed the dispositive threshold issue in this case: can the

7    Court permanently enjoin Plaintiff's FINRA proceedings on the ground Plaintiff waived his arbitration

8    rights? In fact, neither party identified the appropriate standard for *permanent* injunctions in their briefs,

9    though the briefs do touch on the standard for *preliminary* injunctions.[29]

10          The parties correctly observe that "[a] plaintiff seeking a preliminary injunction must establish

11    that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

12    preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public

13    interest." *Winter v. Nat. Res. Defense Council, Inc.*, 129 S.Ct. 365, 374 (2008) (citations omitted). But,

14    the standard for permanent injunctive relief is distinct, at least in part.

15          "Under 'well-established principles of equity,' a plaintiff seeking permanent injunctive relief"

16    _____

17    [27] As noted, MSSB alternatively moves for a preliminary injunction against the FINRA arbitration proceedings while its motion for summary judgment is pending. Because the Court has ruled on that motion, the Court DENIES AS MOOT MSSB's motion for a preliminary injunction.

18    [28] MSSB styles its motion as a motion to "permanently stay" the FINRA arbitration proceedings, but makes clear in its briefs that it seeks a permanent injunction of those proceedings. *See, e.g.*, Doc. 51 at 11. The cases on which MSSB relies to
19    support its assertion that the Court can grant its motion to permanently enjoin the FINRA proceedings—*Alascom, Inc. v. ITT N. Elec. Co.*, 727 F.2d 1419 (9th Cir. 1984), *Int'l Ass'n of Machinists & Aerospace Workers, AFL CIO v. Aloha Airlines,*
20    *Inc.*, 776 F.2d 812 (9th Cir. 1985), and *Se. Res. Recovery Facility Auth. v. Montenay Int'l Corp.*, 973 F.2d 711 (9th Cir. 1992)—are distinguishable and do not support MSSB's position. *Alascom* involved a *plaintiff's* motion for *stay* of arbitration,
21    not a permanent injunction of it. 727 F.2d at 1420. In addition, the stay granted in *Alascom* is premised on the existence of a valid, enforceable arbitration clause, and MSSB's motion to enjoin the FINRA arbitration is premised on its assertion that Plaintiff has waived his arbitration rights (*i.e.*, that he cannot enforce the Arbitration Clause). *See Guifu Li v. A Perfect*
22    *Franchise, Inc.*, No. 5:10-cv-1189-LHK, 2011 WL 2293221, at *5 (N.D. Cal. June 8, 2011). The sole sentence from *Aloha Airlines* on which MSSB relies is from the Ninth Circuit's discussion of whether it had jurisdiction. *See* 776 F.2d at 814-15.
23    In addition, that case arose in the context of a party's motion to compel arbitration. Finally, *Montenay* concerns California law and discusses California cases with procedural postures not applicable here.

24    [29] The Court could deny MSSB's motion for a permanent injunction on this ground alone. *See Anhing Corp. v. Thuan Phong Co., Ltd.*, No. CV 13-5167 BRO (MANx), 2015 WL 4517846, at *14 n.7  (C.D. Cal. July 24, 2015) ("To the extent
25    Defendant requests Plaintiff be enjoined from using the term 'M–THO,' the Court DENIES this request. Defendant has not articulated a legal basis for the request, nor has Defendant addressed the factors applicable to permanent injunctions.").

1   must show:

2       (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary
        damages, are inadequate to compensate for that injury; (3) that, considering the balance of
3       hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the
        public interest would not be disserved by a permanent injunction.
4
    *Cottonwood Environ. Law. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015) (citing *eBay,*
5
    *Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (9th Cir. 2006)). "The standard for a preliminary
6
    injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must
7
    show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Gambell*, 480
8
    U.S. 531, 546 n.12 (1987). Thus, to obtain a permanent injunction, MSSB must establish actual success
9
    on the merits. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) ("Because [the plaintiff]
10
    seeks a mandatory injunction, she must establish that the law and facts *clearly favor* her position, not
11
    simply that she is likely to succeed.") (emphasis in original). "[W]hich raises the question, the merits of
12
    what?" *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1111 (11th Cir. 2004).
13
            MSSB's only argument concerning the merits is in the context of their motion for a preliminary
14
    injunction, in which it "submits that it is likely to succeed on the merits of its argument that Plaintiff has
15
    waived his right to compel arbitration." Doc. 51 at 17. But MSSB's argument that Plaintiff has waived
16
    his arbitration rights is not a *claim*; it is essentially an affirmative defense.[30] MSSB has not provided any
17
    authority suggesting that the Court can grant any injunctive relief where, as here, it is not sought by a
18
    party as a remedy for its underlying claim(s). *See Citigroup Global Markets, Inc. v. VCG Special*
19
    *Opportunities Master Fund, Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010)  ("the standard articulated by these
20
    three Supreme Court cases requires a preliminary injunction movant to demonstrate that it is more likely
21
    than not to succeed *on its underlying claims*") (emphasis added and citations omitted).
22
            The Court concludes that, as a matter of law, MSSB cannot demonstrate success on the merits of
23
_____
24  [30] This would not be the case if, for instance, MSSB brought a separate action or a counterclaim for declaratory relief that
    MSSB cannot be compelled to arbitrate Plaintiff's claims because he waived his arbitration rights and sought injunctive relief
25  as a remedy for the claim. *See Goldman Sachs & Co. v. City of Reno*, 747 F.3d 733 (9th Cir. 2014).

1  any underlying claim because MSSB has no underlying claim on which it could succeed. *See League of*

2  *Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 760 (9th Cir.

3  2014) ("We first analyze whether the LOWD plaintiffs are likely to succeed on the merits of any of their

4  claims"); *see also Alliances for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011)

5  (explaining that "likelihood of success on the merits" pertains to whether party is likely "to prevail on

6  the merits of the underlying claims"). MSSB therefore is not entitled to any injunctive relief against the

7  FINRA arbitration proceedings. Accordingly, the Court DENIES its motion to permanently enjoin those

8  proceedings or any other arbitration proceedings arising from Plaintiff's claims against MSSB.[31]

9  ### V. CONCLUSION AND ORDER

10  For the foregoing reasons, the Court:

11  1. GRANTS MSSB's motion for summary judgment in its entirety in MSSB's favor and against

12  Plaintiff;

13  2. DENIES AS MOOT MSSB's motion for a preliminary injunction (Doc. 51);

14  3. DENIES MSSB's motion to permanently enjoin the FINRA arbitration and any further

15  arbitration proceedings arising from Plaintiff's claims against MSSB (Doc. 51);

16  4. DENIES MSSB's request for attorney's fees and costs associated with the motion; and

17  5. DIRECTS the Clerk of Court to CLOSE this case.

18  IT IS SO ORDERED.

19  Dated:   **August 6, 2015**                          **/s/ Lawrence J. O'Neill**
                                                          UNITED STATES DISTRICT JUDGE

20

21

22

23

24  _____

25  [31] Although the Court denies as moot MSSB's motion for a preliminary injunction, *see supra* n. 27, that motion would fail for the same reasons as does MSSB's motion for a permanent injunction.